NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALLEN BASS,<br><br>               *Plaintiff,*<br>  v.<br><br>TROOPER G. DELLAGICOMA,<br>TROOPER M. HOLGUIN, and<br>TROOPER C. MILLS<br><br>            *Defendants.* | Civ. No. 10-1195 (KSH)<br><br><br><br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Presently before the Court is plaintiff Allen Bass's application for $404,784.38 in attorneys' fees and $11,028.88 in litigation costs and expenses sought in connection with the jury verdict in his civil rights case, which found for him as against Trooper G. Dellagicoma and awarded punitive damages. [D.E. 104 (hereinafter "Plf.'s Fee App.").]

### I. Background

Plaintiff retained the law firm of Hunt, Hamlin & Ridley on a contingency fee basis. On March 5, 2010, the firm filed a complaint on his behalf under 42 U.S.C. § 1983 alleging that three State Troopers, Dellagicoma, Holguin, and Mills, unlawfully arrested and imprisoned plaintiff, subjected him to excessive force, and maliciously filed charges against him based on an incident occurring in July of 2008. [D.E. 1.] The Office of the Attorney General represented the defendants. Counsel for plaintiff engaged in extensive dispositive and pre-trial motion practice, which included defending against a motion for summary judgment and filing successful *in limine* motions. Defendants made clear that they would not pay money damages. Following an 11-day

1

trial, the jury found one of the defendant-Troopers, Gerald Dellagicoma, liable for use of excessive force and awarded plaintiff $45,000 in compensatory damages and $10,000 in punitive damages.  [D.E. 100 (Verdict Form); D.E. 102 (Final Judgment).]  Following the jury verdict, plaintiff filed this motion, defendant filed a timely opposition, and plaintiff replied.  [D.E. 104, 110, 111.]

## II. <u>Reasonableness of the Fee Award: Legal Standard</u>

The Civil Rights Attorney's Fees Awards Act of 1976, codified at 42 U.S.C. § 1988(b), authorizes courts to award "reasonable attorneys' fees" to the prevailing party in a Section 1983 action.  "The plaintiff will be considered a prevailing party when he succeeds on 'any significant issue' that achieves some of the benefit the plaintiff sought in bringing suit."  Federal Judicial Center, *Section 1983 Litigation*, at § XXII (Attorneys' Fees), p. 198 (2d ed. 2008) (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) and *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The parties to not dispute that plaintiff was the prevailing party after the jury verdict and entitled to fees under the statute.

Courts generally employ the "lodestar" method to calculate attorneys' fees, under which the number of hours reasonably devoted to the case is multiplied by the reasonable hourly rate. *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002) (citing *Lindy Bros. Blds., Inc. of Phil. v. Am. Radiator & Stnd. Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (establishing the lodestar method)); *Planned Parenthood of Cent. New Jersey v. Att'y Gen. of State of New Jersey*, 297 F.3d 253, 265 n. 5 (3d Cir. 2002).  "[T]he lodestar method yields a fee that is presumptively sufficient" to achieve Section 1988's objective of "induc[ing] a capable attorney to undertake representation of a meritorious civil rights case."  *Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542, --, 130 S.Ct. 1662, 1672-73 (2010).

The party seeking fees "bears the ultimate burden of showing that its requested hourly rates and the hours it claims are reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc. ("ICO II")*, 426 F.3d 694, 703 n. 5 (3d Cir. 2005), *rev'd in part, aff'd in part,* Nos. 11-3813 & 11-3814 *("ICO III")*, 2013 WL 2397338 (3d Cir. June 4, 2013). The opposing party may challenge the request by objecting "with sufficient specificity." *Id.* The party requesting fees must then "demonstrate to the satisfaction of the court that its fee request is reasonable." *Id.* Although the lodestar is presumed to be reasonable, the court may adjust the lodestar in its discretion. *Perdue,* 559 U.S. at --, 130 S.Ct. at 1672; *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

## III. <u>Discussion</u>

Plaintiff claims that a lodestar figure of $325,827.50 reflects the product of hours reasonably devoted to this litigation multiplied by counsel's reasonable hourly rates. In addition, plaintiff seeks an enhancement of the lodestar figure by 25% -- for a total fee award of $407,284.37.[1] Plaintiff also seeks $11,028.88 for out of pocket expenses. In support, plaintiff submitted certifications of trial counsel, Raymond L. Hamlin, Esq. and Kenyatta K. Stewart, Esq., partners at Hunt, Hamlin & Ridley; certifications of two attorneys in the relevant legal community; internal time sheets; and itemized bills/receipts. [Plf.'s Fee App. at 4, Exhs. A & B thereto, and D.E. 105.]

### A. Hourly Rates

Generally, a reasonable hourly rate is calculated according to the "prevailing market rates in the relevant community," requiring the court to "assess the experience and skill of the

---

[1] Plaintiff's motion cited a lodestar figure of $32<u>3</u>,827.50, however, when you calculate the total hours expended by the hourly rates for each attorney provided in Exh. A at p. 17, the correct figure is $32<u>5</u>,827.50. Thus, a 25% lodestar enhancement would result in a total requested award of $407,284.37 – not $404,284.37.

prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *IMO II*, 426 F.3d at 703, 708 (quoting *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001)); *accord Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 360-61 (3d Cir. 2001). Attorneys may not rest on their own certifications to support a party's claim of reasonable rates; rather, "[t]his burden is normally addressed by submitting affidavits of other attorneys in the relevant legal community attesting to the range of prevailing rates charged by attorneys with similar skill and experience." *Wade v. Colaner*, No. 06-3715, 2010 WL 5479625, at *4 (D.N.J. Dec. 28, 2010) (Wolfson, J.) (quoting *S.D. v. Manville Bd. of Ed.*, 989 F. Supp. 649, 656 (D.N.J. 1998) (Parell, J.)). Once the plaintiff has made the prima facie showing with respect to the appropriate hourly rate, that rate may be contested, "but only with appropriate record evidence. In the absence of such evidence, the plaintiff must be awarded attorneys' fees at her requested rate." *Evans*, 273 F.3d at 361 (quotation omitted).

Plaintiff submits the following hourly rates for trial counsel: $500 per hour for Mr. Hamlin and Mr. Ridley;[2] $300 per hour for Mr. Stewart post-2013 when he became a partner and $250 per hour pre-2013; and $200 per hour for associates, respectively. [*See* Billing Stmt. attached to Fee App. at Exh. A & Hamlin Cert.] Plaintiff states that these hourly rates are reasonable because they reflect counsel's experience level and the quality of their work. [Plf.'s Fee App. at 4.] In support, plaintiff submits two affidavits from attorneys familiar with counsel's background and reputation with similar skills and experiences from the relevant legal community. [*See* D.E. 105 ("Woodruff Cert."); Exh. B to Plf.'s Fee App ("Hawkins Cert.").]

---

[2] Terrance Ridley was the partner at Hunt, Hamlin & Ridley who was originally litigating the case. Mr. Ridley died in November 2012.

Defendants argue that counsel's hourly rates are unreasonable:

> While counsel has submitted the affidavits of two attorneys who have practiced in this field and in this geographical area, they are general in nature, lack specificity as to an hourly rate commonly charged for this specific type of case, do not segregate an appropriate fee for each of the wide variety of tasks performed by Mr. Hamlin during the course of the litigation, do not address plaintiff's lack of success on the vast majority of claims and against the majority of defendants, and, oddly, present identical language when addressing the requested fee of $500 per hour.

[D.E. 110 ("Defs.' Fee App. Opp.") at 6.][3] Defendants go so far as to suggest that a "more appropriate hourly rate would be no more than $400 for Mr. Hamlin (for time in trial) and $300 for Mr. Hamlin and Mr. Ridley (for office time) and $150 for associates' work." [*Id.* at 7.] Finally, defendants indicate that contrary to plaintiff's assertion that Mr. Stewart was a partner at Hunt, Hamlin & Ridley as of January 1, 2013, the Court should calculate his services at an associate rate because the firm's website listed Mr. Stewart as an associate at the time this application was pending. [*Id.*] In plaintiff's reply submission, Mr. Stewart clarifies that he became a partner with the firm in August 2012 and appends a letter dated October 1, 2012 that was filed with the Court and clearly identifies him as such. [D.E. 111 ("Plf.'s Fee App. Reply").]

The Court notes that although defendants criticize plaintiff's supporting evidence – namely, the affidavits of outside attorneys – they fail to supply fee data or other evidence to support their challenge of the hourly rates sought by plaintiff. *See, e.g., Apple Corps. Ltd. v. Int'l Collectors Soc.*, 25 F. Supp. 2d 480, 485 (D.N.J. 1998) (Greenaway, J.) (once fee applicant satisfies the burden of showing their rate or time spent is reasonable, the burden shifts to

---

[3] To the extent that defendants argue that counsel's hourly rates are unreasonable "particularly against a public entity," the Court is not persuaded. *See* Federal Judicial Center, *Section 1983 Litigation*, at § XXII (Attorneys' Fees), p. 197 (2d ed. 2008) ("The fiscal impact of a fee award upon a municipality . . . and the fact the fees will ultimately be paid by taxpayers have all be held *not* to be 'special circumstances' justifying either a denial or reduction of fees.")

defendant to rebut the reasonableness of the proposed fees); *accord Evans, supra.* The Court has reviewed the certifications from two outside attorneys practicing in Essex County, Robert Woodruff and Edlridge Hawkins, who have significant experience in the area of civil rights. [Woodruff Cert. at ¶¶ 2-3, 6; Hawkins Cert. at ¶¶ 2, 9.] Both affiants are familiar with the general hourly rates for attorneys in the area of civil rights litigation in the community and attest that Mr. Hamlin's hourly rate is commensurate with his level of expertise and skill and reasonable in the community. [Woodruff Cert. at ¶¶ 6-7; Hawkins Cert. at ¶¶ 10-13.] Counsel's own certifications point out that Mr. Hamlin has been handling civil rights matters in New Jersey for approximately 20 years, has successfully litigated and settled matters on behalf of plaintiffs, and has served as defense counsel for municipal entities in civil rights cases across the state while Mr. Stewart has also successfully settled civil rights matters and is currently defending several municipal entities alleged to have committed civil rights violations. [D.E. 104-4 ("Hamlin Cert."); D.E. 104-5 ("Stewart Cert.").] Plaintiff has satisfied his burden of showing the hourly rates charged by counsel are reasonable as they are within the range charged by attorneys with similar skill and experience in the community. [Woodruff Cert. at ¶¶ 6-7; Hawkins Cert. at ¶¶ 9-11.]; *IMO II*, 426 F.3d at 703, 708; *Wade v. Colander*, No. 06-3715, 2010 WL 5479625, at *4.

With respect to Mr. Stewart's partnership status at the firm, the Court accepts his representation that he became partner in August 2012 -- recognizing plaintiff's application only requests Mr. Stewart's time be billed at a rate of $250 pre-2013 and $300 post-2013. [Billing Stmt. at 17.] Lastly, the billing statement submitted in support of plaintiff's fee application belies defendants' implication that Mr. Hamlin submitted hours at his $500 rate for ministerial tasks. Mr. Hamlin never billed for telephone calls with his client, or anyone for that matter, and

tasked associates with a majority of the correspondence and discovery drafting and preparation.

[*See generally* Billing Stmt.]

Based on the foregoing, the Court finds that the hourly rates submitted by plaintiff are reasonable.

### B. Hours Expended

Once a reasonable hourly rate is determined, the Court is "obligated to 'review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" *Evans,* 273 F.3d at 362 (quoting *Maldonado v. Houstoun,* 256 F.3d 181, 184 (3d Cir. 2001)); *IMO III,* 2013 WL 2397338, at *10. Recognizing that "the district court retains a great deal of discretion in deciding what a reasonable fee award is," the Third Circuit has indicated that "[i]n determining whether the fee request is excessive . . . the court will inevitably be required to engage in a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires." *Id.* Accordingly, the Court has thoroughly examined the billing statement submitted by plaintiff and will address defendants' 11 specific contentions regarding hours expended by plaintiff's counsel -- time billed that defendants believe is "excessive, redundant or otherwise unnecessary." [Defs.' Fee App. Opp. at 8-11 (citing *McKenna v. City of Philadelphia,* 582 F.3d 447, 454 (3d Cir. 2009)).]; *see IMO II*, 426 F.3d at 711 (when examining hours expended, the court may reduce an award "in response to specific objections made by the opposing party.").

### 1) Preparing Initial Pleading Documents

Defendants object to 6.5 hours billed by Mr. Stewart – when he was an associate – for drafting and preparing the complaint, case information statement, and cover letter. [Defs.' Fee

App. Opp. at 8.]  Defendants argue this time seems excessive "[c]onsidering that this case was not unique in either the nature of the claims or the identity of the defendants and that law offices generally draft complaints based on templates or 'cut and paste' from similar matters."  [*Id.*] Other than the generalization that law firms prepare initial pleadings through cutting and pasting previously filed documents, defendants proffer no credible argument or proofs that suggest the time spent preparing the complaint and supporting documents was excessive.  Therefore, the Court is satisfied that the time submitted for preparing and filing the initial pleading is reasonable.

### 2)     Reviewing Answer and Defenses

Mr. Hamlin and Mr. Stewart billed one hour each to review defendants' Answer and Separate Defenses. [Billing Stmt. at 2.] Defendants submit that this time is redundant and duplicative.  [Defs.' Fee App. Opp. at 8.]  The Court disagrees and finds that this time is reasonable.

### 3)     Preparing Interrogatories and Document Requests

On June 2 and 3, 2010, an associate billed 5.75 hours for meeting with plaintiff and drafting his first set of interrogatories and document requests.  [Billing Stmt. at 2.]  On June 4, 2010, Mr. Hamlin billed 2.25 hours for reviewing same.  [*Id.* at 3.]  Defendants argue that "[c]onsidering that the number of interrogatories is limited by Rule to 25 this seems excessive both in the compilation as well as the review." [Defs.' Fee App. Opp. at 8.]  In light of the fact that an associate was tasked with meeting with plaintiff to prepare these discovery items and because the Court will not comment on the time reasonably devoted to documents the defendants did not submit for the Court's review, these entries cannot be considered excessive.

### 4) Reviewing Confidentiality Order

Defendants contend that the 2.25 total hours Mr. Hamlin and Mr. Stewart spent reviewing the proposed Discovery Confidentiality Order is "both excessive and redundant," because the order "is a standard document relied upon by [the Attorney General's office] and drafted in accordance with the Local Rules governing the entry of such orders." [Defs.' Fee App. Opp. at 8-9.] Mr. Hamlin's billing entries indicate that on June 5, 2010 he "[r]eviewed proposed Discovery Confidentiality Order *and* Declaration of Jennifer Hsia." [Billing Stmt. at 3 (emphasis added).] The next day, Mr. Stewart billed for reviewing the proposed Discovery Confidentiality Order. [*Id.*] The docket indicates that on June 11, 2010, the Discovery Confidentiality Order – a seven-page, single-spaced document – executed by both parties was submitted to then-Magistrate Judge Patty Shwartz for her signature. [D.E. 7.] On June 28, 2010, Judge Shwartz refiled an executed copy of the Discovery Confidentiality Order with handwritten edits. [D.E. 8.] On June 30, 2010, Mr. Hamlin's billing entry states that he reviewed this Order. [Billing Stmt. at 3.] Based on the foregoing, the Court is not persuaded that the 2.25 hours billed for reviewing the Discovery Confidential Order and the supporting declaration is excessive or redundant especially in light of the modifications made by Judge Shwartz.

### 5) Preparing Personnel File Letter

Defendants complain that 7.75 hours billed by an associate for preparing, completing, and reviewing "what appears to be the same letter to the court regarding the personnel files of the defendant Troopers and related discovery issues," is "excessive for what purports to be a 'letter,' not a motion." [Defs.' Fee App. Opp. at 9.] Based on the billing entries, the Court is not persuaded that the time called into question by defendants was in preparation of a single letter. However, even assuming these hours were spent preparing a single letter to Judge Shwartz, the

Court's order of September 28, 2010, undercuts defendants' characterization of plaintiff's letter. [D.E. 10.] The record shows that after considering plaintiff's filed request "for additional information from the files for the individual defendants and the files of nonparties," conducting a telephone conference on the record on September 28, 2010, and reviewing the governing law, Judge Shwartz ordered defendants to "produce documents reflecting any complaints or discipline against the individual defendants for failing to activate the MVR during the period of July 10, 2006 through July 10, 2008." [*Id.*] The Court does not find that the time billed for researching and preparing a submission to the Court regarding the defendant-Troopers prior disciplinary complaints, among other discovery issues, is excessive. This is especially true in light of plaintiff's reliance on such evidence at trial.

### 6) Preparing for Troopers Van Lenten and Dellagicoma's Depositions

Defendants allege that "[b]etween 10/1 and 10/5/10 counsel spent a total of 51 hours reviewing documents 'in preparation' for the depositions of Troopers Van Lenten[4] and Dellagicoma." [Defs.' Fee App. Opp. at 9.] Defendants go so far as to state that "[i]n and of itself this is excessive but in light of the fact that the depositions of both Troopers took only a total of 4 hours (10/6/10), it is particularly egregious." [*Id.*] Defendants misread the billing entries. Between October 1, 2010 and October 4, 2010, Mr. Hamlin billed 30 hours for reviewing hundreds of documents in preparation of "the depositions of ***Plaintiff***[,] Defendant Dellagicoma[,] and Trooper Van Lenten." [Billing Stmt. at 5-6 (emphasis added).] On October 4, 2010, Mr. Hamlin spent another 8.5 hours preparing *plaintiff* for his deposition, scheduled for the next day, as well as continuing his preparation for defendant Dellagicoma and Trooper Van Lenten's depositions, scheduled for October 6, 2010. [*Id.* at 6.] Indeed, on October 5, 2010, the

---

[4] Trooper Van Lenten was the passenger officer in defendant-Trooper Mills' patrol car when the defendants arrested plaintiff on July 10, 2008 but was not a named-defendant.

last billing entry called into question by defendants under this point, Mr. Hamlin billed 12.50 hours for attending a pre-deposition meeting with plaintiff, attending the deposition of *plaintiff*, and finalizing preparations for the following days depositions of defendant Dellagicoma and Trooper Van Lenten. [*Id.*] Notwithstanding defendants' failure to acknowledge that the time it complained of included preparation for- and attendance of- plaintiff's own deposition, the Court must also disagree that the litmus test for determining reasonableness of time spent preparing for a deposition is the length of the actual deposition. Based on the foregoing, defendants' challenge to the time Mr. Hamlin billed for preparing for the depositions of plaintiff, defendant-Trooper Dellagicoma, and Trooper Van Lenten, and attending the deposition of plaintiff, is rejected as both without merit and poorly presented to the Court .

### 7) Preparing for Sergeant Nardone's Deposition

Defendants allege that 15.75 hours Mr. Hamlin spent preparing for the deposition of Sergeant Nardone "is inherently excessive and emphasized by the fact that Nardone's deposition consumed only 2.5 hours." [Defs.' Fee App. Opp. at 9.] Mr. Hamlin's billing entries indicate that from November 15, 2010 to November 17, 2010, he billed *15.35* [once again, defendants misstate the challenged billing entry] hours for: "preparation for deposition of Sgt. Raymond Nardone, including review of all investigation reports, IA reports, arrest reports, and reprimands." [Billing Stmt. at 7.] Sergeant Nardone was a fact witness who conducted the internal investigation of the allegations made by plaintiff and testified at trial about: standard operating procedures; the parameters of his investigation into defendants' conduct on July 10, 2008; and his findings, including his conclusion that the defendants' violated the standard operating procedures for use of the Mobile Video Recorder on July 10, 2008. [*See, e.g.,* Tr. Day 2, 95:22-97:24, 99:5-103:22; Tr. Day 3, 4:4-16:3, 20:25-23:14, 45:19-51:8.] The Court is not

persuaded that the time Mr. Hamlin spent preparing for the deposition of an important witness –
who ultimately testified at trial for almost one full day – must be commensurate with the length
of his deposition session.

### 8) Preparing Final Pretrial Order

Defendants contend that 25.75 hours spent between May 12, 2011 and May 27, 2011
reviewing material for- and preparing the- Final Pretrial Order "[w]hile not glaringly excessive,"
should be considered redundant and reduced by at least 6.5 hours because the entries "indicate
work was done by 2 attorneys and there is no breakdown or differentiation as to the nature or
intent of the work."  [Defs.' Fee App. Opp. at 10.]  The Court does not find that the hours Mr.
Hamlin and Mr. Ridley spent collaborating to prepare the Final Pretrial Order were redundant in
light of the fact that Mr. Hamlin billed for a majority of the preparation but Mr. Ridley ultimately
attended the Final Pretrial conference – thus, their joint efforts in preparing the order were not
unreasonable.

### 9) Reviewing Defendants' Motion for Summary Judgment & 10) Preparing Opposition to Defendants' Motion for Summary Judgment

Defendants allege that the time spent by Mr. Hamlin reviewing the defendants' motion
for summary judgment and then separately preparing plaintiff's opposition to that motion – a
total of 84.25 hours – is "excessive and unnecessary."  [Defs.' Fee App. Opp. at 10.]  The Court
will review these challenges together.

Defendants' motion for summary judgment, while comprehensive and stuffed with over
70 sources of legal authority and equal citations to discovery documents, was rooted in run-of-
the-mill Section 1983 legal theories.  [*See, e.g.,* D.E. 42 (Point I: Official capacity immunity and
respondeat superior; Point II: Elements of unlawful arrest, unlawful imprisonment, and malicious
prosecution; Point III: Verbal threshold under New Jersey Torts Claim Act).]  Between

November 28, 2011 and December 3, 2011, Mr. Hamlin billed 42.5 hours for "review of defendants' summary judgment motion including transcripts and certifications and review of cases cited in defendants brief in addition to review of voluminous file documents." [Billing Stmt. at 10-11.] Between December 5, 2011 and December 8, 2011, Mr. Hamlin billed an additional 41.75 hours for "preparation of brief in opposition to summary judgment motion including review of depositions, identifying deposition citations, research, and review of file documents." [*Id.* at 11.] On December 8, 2011, Mr. Hamlin filed a similarly comprehensive opposition brief and Rule 56 statement on behalf of plaintiff containing a great deal of legal authority and extensive citations to the discovery record. [D.E. 46.]

Notably, the transcripts and certifications cited in- and appended to- defendants' motion for summary judgment, and thereafter reviewed by Mr. Hamlin, are portions of the same documents later appended to Mr. Hamlin's certification in support of plaintiff's opposition brief. [*See, e.g.,* Defs.' Exh. C & Plf.'s Exh. D are the transcript of Dellagicoma's deposition; Defs.' Exh. D and Plf.'s Exh. A are Dellagicoma's police report.] In other words, a number of the documents Mr. Hamlin reviewed upon receiving defendants' summary judgment motion are the same as those reviewed and relied upon in preparing plaintiff's opposition brief. In light of this, the Court finds that these hours should be reduced by 24 hours.

### 11) Preparing for Trial

Finally, defendants argue that a reduction in the amount of time Mr. Hamlin and Mr. Stewart billed for trial preparation is warranted because it is "both excessive and redundant." [Defs.' Fee App. Opp. at 10-11.] Between December 26, 2012 and January 6, 2013, Mr. Hamlin billed 144 hours and Mr. Stewart billed 58 hours for "trial preparation including review of file documents, depositions, interrogatories, and medical records." [Billing Stmt. at 14-15.]

Reviewing the Certifications, and relying on its own recollection of the trial, the Court is well aware of the active role played by Mr. Stewart. [*See, e.g.,* Stewart Cert. at ¶¶ 14-15 (noting that he "assumed responsibility for the cross examination of one of the defendants and prepared cross examination for witnesses who the defendants did not elect to call as witnesses as well as participate in the identification of issues related to the jury charge.").] As lead counsel, Mr. Hamlin handled the majority of the witnesses and demonstrated a thorough knowledge of the facts; as well, he strategically focused his direct and cross-examinations so that they effectively and efficiently served plaintiff's cause, which is only possible when the attorney has mastered the record. As defendants themselves acknowledge, "preparation for trial is mandatory and a professional obligation of each attorney," and as such, in making its judgment call, the Court finds that the time allocated to trial preparation was reasonable.

Based on the foregoing, and accounting for the 24 hour reduction in hours ($12,000), the lodestar figure is $313,827.50.

### C.   Lodestar Adjustment

In its recent examination of lodestar adjustments, the Supreme Court held that "the lodestar method yields a fee that is presumptively sufficient to achieve [Section 1988's] objective" of attracting competent counsel to undertake meritorious civil rights cases. *Perdue v. Kenny A. ex rel. Winn, supra* 559 U.S. at --, 130 S.Ct. at 1672-73. How and whether that presumption holds in a given case is the gravamen of *Perdue.* Here, defendants seek a 60% lodestar reduction and plaintiff seeks a 25% lodestar enhancement. [Plf.'s Fee App. at 4-7; Defs.' Fee App. Opp. at 20.]

#### 1.   Defendants' Requested Lodestar Reduction

Defendants take the position that the Court should cut the lodestar by over one half "in light of plaintiff's lack of success on all claims except excessive force as well as his lack of

success against the State Police and two of the three individual defendants." [Defs.' Fee App. Opp. at 20.] Plaintiff argues that defendants' position is wrong because his causes of actions were "born of a common nucleus." [D.E. 111 ("Plf.'s Fee App Reply Br.") at 3.]

The extent to which plaintiffs' claims are related to one another, and, for that matter, the interrelationship between and among defendants, is important. Third Circuit has held that "an attorney's work on unsuccessful claims not related to the claims on which the attorney succeeded is not compensable, because such work 'cannot be deemed to have been expended in pursuit of the ultimate result achieved.'" *McKenna*, *supra,* 582 F.3d at 455 (quoting *Hensley*, 461 U.S. at 434-35). But "[t]he propriety of [reducing the lodestar for unsuccessful claims] depends upon whether the unsuccessful claims were, in fact, distinct." *Id.* at 457. Indeed, "*Hensley* cautions that courts should not reduce fees simply because some of a prevailing party's *related* claims are unsuccessful." *Id.* (citing *Hensley*, 461 U.S. at 434-35) (emphasis in original). "For example, where a plaintiff's claims involve 'a common core of facts' or are based on 'related legal theories, . . . [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* (citing *Hensley*, 461 U.S. at 435). It is plaintiff's burden to establish "that the time spent pursuing the unsuccessful claims contributed in any way to [his] success on his remaining claims." *Hensley*, 461 U.S. at 435.

Defendants argue that in addition to the parties and causes of actions dismissed at the dispositive motion stage at least 75% of the trial time was devoted to plaintiff's unsuccessful attempts to prove his remaining allegations that he had been falsely arrested, false imprisoned, and/or maliciously prosecuted:

> Plaintiff here was unsuccessful on all claims except the use of
> excessive force. Despite the fact that plaintiff emphasized that this

case was about the violation of plaintiff's rights to be free from the oppression of these troopers singling him out for doing nothing more than riding his bike on the sidewalk; for stopping him with no valid reason to do so; for arresting him without the merest of reasons and for prosecuting him without a valid reason, the jury completely rejected these claims.

Beginning with opening statements, continuing throughout the trial and even into summation where counsel minimized the issue of physical injuries suffered by the plaintiff, the focus of plaintiff's energies, arguments and questioning was on the issues the jury decided had no viability at all.

. . .

. . . This case was not the traditional, "he said, she said" litigation. There existed independent, objective evidence, both in the form of recorded statements as well as the potential live testimony of the individuals who created those records against which the jury could measure the plaintiff and his courtroom testimony. Plaintiff took the chance that he would somehow overcome this significant impediment to success on these claims. He did not and the defendants should not be made to pay now for the plaintiff's reckless gamble.

[Defs.' Fee App. Opp. at 14, 17, 19.]

In response, plaintiff maintains that the causes of action pursued at trial shared a common

nucleus:

Over plaintiff's objections, the defendant sought to and did include all of the circumstances which led up to the plaintiff's arrest. Were plaintiff's counsel to ignore all of the facts which were presented at trial, perhaps plaintiff would not have prevailed. Clearly, all of the information leading up to plaintiff's arrest was the same whether or not there was a cause of action for malicious prosecution and false arrest and false imprisonment. In addition, the testimony of what occurred after plaintiff's arrest was necessary to establish plaintiff's damages.

. . .

In this case, there was one plaintiff and one set of facts that would have been presented to the jury whether or not there were other claims asserted by the plaintiff. It defies logic that the defendants

> would not have sought to include the circumstances surrounding
> the arrest of Mr. Bass if there was only an excessive force claim.
> As such, the defendants' argument should be summarily rejected.

[Plf.'s Fee App. Reply at 3-4.]

In further support of their request for a lodestar reduction, defendants rely upon *McKenna*, *supra*, a case in which the Third Circuit affirmed the lower court's reduction of fees for time spent in furtherance of unsuccessful malicious prosecution, excessive force, and first amendment retaliation claims after finding they did not share a common core of facts with plaintiff's successful false arrest claim. [Defs.' Fee App. Opp. at 16-17 (citing 582 F.3d at 458).] While most of the causes of action pled in *McKenna* mirror those advanced by plaintiff here, the facts, timeline, and legal theories are distinguishable. Seventeen-year-old Timothy McKenna was arrested at a street celebration he attended with his parents and aunt following an Eagle's game. *McKenna,* 582 F.3d at 452. Timothy's parents followed him to police headquarters and videotaped the operations room -- an area that was not open to the public but could be viewed through a window of the public area. An officer asked Timothy's parents to stop videotaping but they refused. Shortly after, Timothy's parents were escorted from the building and he was transported to a hospital for evaluation because he complained of injuries. Timothy was ultimately released to his parents and the police filed disorderly conduct charges against him. A local court later dismissed the disorderly conduct complaint for lack of prosecution after the police did not appear for several scheduled proceedings. *Id.* at 452-53. Timothy, his parents, and his aunt brought a Section 1983 action against the city and various police officers alleging false arrest, excessive force, malicious prosecution, and first amendment retaliation. *Id.* at 453. Notably, the first amendment claim alleged that defendants improperly delayed Timothy's release in retaliation against his father's action in bringing a *prior* lawsuit against the City, and

for the McKennas' refusal to stop videotaping the operations room. *Id.* Following summary judgment, the city was dismissed as a party and the case proceeded to trial against the four defendant officers. The jury found in favor of defendants on all counts except Timothy's false arrest claim against one officer. The jury awarded Timothy $150,000 in damages. *Id.*

Upon reviewing plaintiff's fee application, the lower court first excluded a substantial amount of time submitted because of the sloppy and "mistake-filled" nature of the application. *Id.* at 456, n. 9. The court then determined that Timothy's "successful false arrest claim did not share a common core of facts with his own unsuccessful claims or with the other three plaintiffs' unsuccessful claims," and therefore, "the time spent in pursuit of these unsuccessful claims was not compensable under *Hensley*." *Id.* at 458. On appeal, the Third Circuit affirmed recognizing the fact-sensitive nature of fee determinations:

> In reviewing the District Court's conclusion, we note that the unsuccessful malicious prosecution and First Amendment retaliation claims concerned separate incidents that occurred after Timothy's arrest, and plaintiffs brought them under separate legal theories. On the other hand, the excessive force claims concerned events that were temporally proximate to Timothy's wrongful arrest. Nonetheless, we conclude that the District Court did not abuse its discretion in concluding that these claims did not share a common core of facts with the successful false arrest claim. Establishing relatedness on a claim-by-claim basis in the attorneys' fees context is a fact-intensive determination that rightfully belongs within the District Court's discretion, given the trial court's 'superior understanding of the litigation and the desirability of avoiding frequently appellate review of what essentially are factual matters." *Hensley,* 461 U.S. at 437. Here, the District Court reasonably concluded that Timothy failed to carry his burden to establish that the time spent pursuing the unsuccessful claims contributed in any way to his success on the false arrest claim, and that therefore no fees should be awarded for time spent on those unsuccessful claims.

*Id.*

The Third Circuit makes two points in this passage: first, the trial court is uniquely positioned to determine the relatedness of claims and second, the plaintiff has the burden of establishing that the time spent pursuing the claims that were unsuccessful contributed to his success in the claims he won. This, plaintiff easily can do. Three State Troopers, assigned to assist the municipal police force in high crime areas in Irvington, chased down the plaintiff and arrested him. It took the full airing of the facts from the testimony of the parties before the eight-person jury decided the relative responsibility of the Troopers for plaintiff's injuries. Based on the evidence elicited in discovery, plaintiff was not in a position to dismiss his original charges against any of the Troopers, something that was recognized when the Court denied defendants' summary judgment motion. The Troopers' activities after they arrested plaintiff included taking him to police headquarters, strip-searching him in a public area, taking him then to the hospital, and then placing him in jail where he remained for eight days. Throughout, it was the defendants' position that plaintiff was on drugs. By finding that plaintiff had in fact been subjected to excessive force, the jury cut through a defense largely based on focusing on the victim rather than the aggressor or aggressors. The entire story of the conduct of the Troopers is a narrative that is inseparable from the excessive force charge. The Troopers' treatment of plaintiff by tackling him off his bike and injuring him and thereafter subjecting him to a humiliating public strip search, the lack of documentary or physical evidence of the Troopers' claimed recovery of drugs at the scene, the failure to show up at subsequent court proceedings after filing charges against plaintiff, even the continuing failure to return plaintiff's bicycle to him, all reflect the defendants' excessive and illegal exercise of their authority to police the streets. Producing evidence of the whole story of how plaintiff was treated was the natural and

indeed only way to litigate the issue that the jury ultimately decided: a citizen on the streets of a crime-blighted neighborhood still has fourth amendment rights.

### 2. Plaintiff's Requested Lodestar Enhancement

In *Perdue*, the trial judge granted a 75% enhancement to the lodestar calculation in a lawsuit seeking the vindication of civil rights. In striking the enhancement as arbitrary, the Supreme Court reversed the affirmance of the Eleventh Circuit and held that there is a "strong presumption that the lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue*, 559 U.S. at --, 130 S.Ct. at 1673 (internal quotations omitted). Generally, to warrant an enhancement, there must be specific evidence supporting the award. *Id.* at 1672-74.

Albeit *Perdue* speaks in broad terms, it arose under circumstances very different from the case at bar. The underlying litigation was a class action that was mediated – not tried. Class members sued the Georgia foster care system for deficiencies that allegedly violated foster children's constitutional and statutory rights. *Id.* at 1669. Judge Shoob, sitting in the Northern District of Georgia, referred the case to mediation and approved the settlement ultimately reached by the parties. The settlement decree resolved all pending issues other than the fees that plaintiff's attorneys were entitled to receive under Section 1988. *Id.* at 1669-70. The district court calculated a $6 million lodestar figure and then enhanced the award by 75% based on: (1) the attorneys' advancement of $1.7 million of expenses over three years without receiving any reimbursements; (2) the absence of ongoing pay to the attorneys; (3) the fully contingent nature of the case; and (4) the attorneys' extraordinary high degree of "skill, commitment, dedication, and professionalism." *Id.* at 1670 (citing district court opinion at 454 F. Supp. 2d 1260, 1288

(N.D. Ga. 2006)).  According to Judge Shoob, the results obtained were "extraordinary" and plaintiff's attorneys had exhibited "a higher degree of skill, commitment, dedication, and professionalism . . . than [he had] seen displayed by the attorneys in any other case during [his] 27 years on the bench." *Id.* (citing 454 F. Supp. 2d at 1289).  As he wrote, "After 58 years as a practicing attorney and federal judge, the Court is unaware of any other case in which a plaintiff class has achieved such a favorable result on such a comprehensive scale.'" *Id.* (citing 454 F. Supp. 2d at 1290).  Judge Shoob's lodestar enhancement resulted in an additional $4.5 million fee award.  *Id.*

A divided panel of the Eleventh Circuit affirmed the fee decision.  The circuit denied rehearing en banc over the dissent of three judges, including Judge Tjoflat who contended that "by basing the enhancement in large part on a comparison of the performance of respondents' attorneys with all of the unnamed attorneys whose work he had observed during his professional career, [Judge Shoob] had improperly rendered a decision that was effectively unreviewable on appeal and had essentially served as a witness in support of the enhancement.'"  *Id.* at 1671 (citing Circuit opinion at 547 F.3d 1319, 1326-27 (11th Cir. 2008)).  In rejecting the 75% enhancement as arbitrary, the Supreme Court echoed this criticism, pointing out that "when a trial judge awards an enhancement on an impressionistic basis, a major purpose of the lodestar method – providing an objective and reviewable basis for fees is undermined." *Id.* at 1676 (citation omitted).

Here, Allen Bass successfully litigated against a New Jersey State Trooper who the jury found had committed acts of police brutality such that it awarded punitive damages.  Counsel for Bass adduced evidence that three Troopers who were assigned to assist the municipal police force in high crime neighborhoods in Irvington, chased down Bass as he was riding his bike on

the sidewalk, tackled him off his bike and onto to the ground, and arrested him.  As stated above, after they arrested plaintiff the Troopers took him, albeit he was injured, first to police headquarters where they subjected him to a strip-search in a public area, then to the hospital where he was treated for a fractured orbital bone and other injuries, and then returned him to jail where he was held for eight days.  Trooper Dellagicoma charged Bass with possession of a controlled dangerous substance; possession of a controlled dangerous substance with intent to distribute; possession of a controlled dangerous substance within 1000 feet of a school zone; resisting arrest by flight; and resisting arrest by force.  All of these charges were dismissed after Trooper Dellagicoma failed to appear at plaintiff's trial despite receiving a subpoena to appear and follow-up telephone calls from the prosecution.  In his trial testimony, Trooper Dellagicoma failed to proffer a justifiable reason for why he failed to appear at plaintiff's trial.  Further, although it was the defendants' position that plaintiff was on and in possession of drugs at the time of his arrest, they failed to introduce in evidence the drugs allegedly recovered at the scene or provide any documentation supporting the existence of drugs, by way of a lab report or other findings.

Throughout the proceedings, defendants deemed this to be a "no pay" case and remained steadfast in their focus on the plaintiff as a person with a criminal past who was an admitted drug user.  In the face of all of this, plaintiff's attorneys, captained by Mr. Hamlin, won a victory for their blemished client by exposing what Trooper Dellagicoma did rather than focusing on who the plaintiff was.  Having presided over the case, this Court is in a good position to say that by dint of extraordinary effort and skill, plaintiff's attorneys vindicated the fourth amendment as not yet extinct in a high crime area, a victory that inures not just to Allen Bass but to any citizen living in cities like Irvington.  Exposed to what plaintiff's counsel's strategy and skill revealed as

systematic abuses of power, the jury awarded plaintiff thousands of dollars in compensatory and punitive damages. To say that the extraordinary effort displayed by plaintiff's counsel should not be acknowledged and rewarded beyond the lodestar is to thin out the ranks of an already narrow field of lawyers interested in representing such plaintiffs. The Court considers this feature of Mr. Hamlin's firm's representation – courage in taking the case and skill in achieving a constitutional victory despite serious odds – to be significant, and deserving of an enhancement of the lodestar. Just as the award of punitive damages serves as a deterrent to conduct like Trooper Dellagicoma's, a lodestar enhancement properly compensates lawyers who made the difficult and unapplauded decision to represent a citizen living in the margins economically and socially whose rights were disregarded and who suffered injury and humiliation.

An enhancement speaks beyond this particular case, just as Bass's victory speaks to the rights of every citizen. Senator Tunney, who sponsored the original version of the Fees Act, observed in support of the legislation that "[i]f a defendant may feel that the cost of litigation, and, particularly, that the financial circumstances of an injured party may mean that the chances of suit being brought, or continued in the face of opposition, will be small, there will be little brake upon deliberate wrongdoing." 122 Cong. Rec. S33313-14 (daily ed. Sept. 29, 1976) (statement of Sen. John V. Tunney). Given the defendants' settlement strategy and their focus on the less savory circumstances of this plaintiff, a lawsuit in other hands than these attorneys' might not have been brought or continued, and there would be no brake upon deliberate wrongdoing.

In his application, plaintiff echoed these concerns:

> Vigorous and aggressive representation and protection of personal liberties are important concerns to civil rights litigants and professionals. These goals cannot be actualized unless members of

> the bar, sometimes at great personal sacrifice, undertake these
> tasks in defense of people's rights.
>
> In order to prevail in the instant case, plaintiff's counsel had to
> convince a jury that an individual w/ a criminal history and
> admitted drug use was worthy of belief in comparison to members
> of law enforcement who are sworn to uphold the law.

[Plf.'s Fee App. at 2.]

The Court is satisfied that the limitations espoused in *Perdue* on judicial discretion do not preclude a lodestar enhancement here. To be clear: there is always a David and Goliath aspect in cases like this and selfless dedication may be found in a large percentage of them. But enforcing the fourth amendment rights of a citizen who lives and even uses drugs in a high crime neighborhood is much harder than enforcing the fourth amendment in the suburbs, and a lawyer has to be better and more courageous to prevail, which the Court believes supplies the specific factors the Supreme Court wants to see when a judge approves a fee above the lodestar in a civil rights case. Based on the foregoing, the Court is satisfied that a lodestar enhancement of 15%, which brings the fee award to $360,901.62, is warranted.

**D. Costs**

Plaintiff seeks $11,028.88 in costs and expenses that were incidental and necessary to this litigation. [Plf.'s Fee App. at 7-8 (citing *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 30 (D.C. Cir. 1984).] The Court was provided with itemized receipts and bills verifying the amount and payment of these costs and expenses [*See* Exh. A to Plf.'s Fee App.]; Defendants do not dispute them; and they will be reimbursed in full.

## IV.  **Conclusion**

For the foregoing reasons, the Court will award plaintiff's trial counsel $360,901.62 in fees and $11,028.88 in costs and expenses for a total award of 371,930.50.  Plaintiff's counsel shall submit an order embodying the findings and rulings in this decision.


**Date**: June 28, 2013                                                    /s/ Katharine S. Hayden_____
                                                                                  Katharine S. Hayden, U.S.D.J.